## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DAWN FLOWERS,                          )
                                       )
      Plaintiff,                )
                                       )        No. 06 C 7061
vs.                                    )        Magistrate Judge Schenkier
                                       )
MICHAEL ASTRUE,                        )
Commissioner of Social Security,       )
                                       )
      Defendant.                )

## MEMORANDUM OPINION AND ORDER

This case involves an appeal from the Social Security Administration by plaintiff, Dawn

Flowers, after a denial by the Commissioner of Social Security ("Commissioner") of Ms. Flowers'

June 23, 2004 applications for Supplemental Security Income ("SSI") and Disability Insurance

Benefits ("DIB"). Ms. Flowers claims an onset of disability date of March 30, 2003 (R. 69). Her

applications for benefits were denied by an Administrative Law Judge ("ALJ") on May 24, 2006 (R.

25, 246), and by the Appeals Council on October 27, 2006 (R. 5), making the ALJ's opinion the final

decision of the Commissioner. This appeal followed. For the reasons stated below, the Court grants

Ms. Flowers' motion for remand (doc. # 24) and denies the Commissioner's motion for affirmance

(doc. # 29).[1]

I.

We begin with a brief review of the legal standards. In order to establish a "disability" under

the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason

---

[1]On February 20, 2007, by joint consent of the parties and pursuant to 28 U.S.C. § 636(c), the Executive
Committee reassigned this case to this Court for all proceedings, including entry of final judgment (doc. ## 12, 15).

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A) (2002). A claimant must demonstrate that her impairments prevent her from performing not only her past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(1)(A) (2002).

The social security regulations prescribe a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2002). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimant's RFC to perform the past relevant employment. *See* 20 C.F.R. § 404.1520(c). If a person can still do this kind of work, the Commissioner will find that the person is not disabled. *Id.* The Step 5 analysis involves an evaluation of the claimant's RFC to perform any other work in the national economy (other than the relevant past occupation). *See Bowen v. Yuckert*,

482 U.S. 137, 142; 20 C.F.R. § 1520(f). If a person with such a RFC can still find jobs in the national economy, the Commissioner will find the person not disabled.

In reviewing the ALJ's decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g) (2002), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. R.R. Retirement Bd.*, 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). When conflicting evidence allows reasonable minds to differ, the responsibility for determining whether the claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181; *see also Stuckey v. Sullivan*, 881 F.2d 506 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curium).

However, the ALJ is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not elect and discuss only the evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id.*; *see also Young*, 957 F.2d

3

at 393 (the ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See e.g. Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

## II.

The following facts are taken from the record and are material to the disability decision we are reviewing. We begin with general background and then move to the medical evidence and the facts found by the ALJ in her opinion denying benefits.

### A.

Dawn Flowers was born on November 15, 1981 (R. 51, 88). She has a high school degree and completed one year of college at McHenry County College in 2001, where she studied Cosmetology (R. 86, 215, 252). She has strong computer skills (R. 146). She describes herself as very artistic (R. 130).

Ms. Flowers is single and has no children (R. 160). She has always lived with at least one of her parents, her father, Don, and/or her mother, Colleen, as well as her sister, Heidi (two years younger), and her brother, Jeff (four years younger) (R. 106, 215). She does not pay rent (R. 69, 146); she has no money of her own (R. 115); and she does not own a car (although she can drive and often borrows her mother's car) (R. 130). Ms. Flowers's parents divorced when she was young

4

(R. 160). Her father, Don, is still involved with Ms. Flowers's life and is described as very

supportive of her; but since the divorce, Mr. Flowers has often not been present in her home (R.

216).

Ms. Flowers has suffered from mental illness since she was about 13 years old and in eighth

grade (R. 160). In 2004, Ms. Flowers described her condition like this:

> [Ms. Flowers] reports that she began to experience depression when she was in 8th
> grade. About that time, there were some family problems. Her parents were
> divorced prior to this. She was beginning to experience highs and lows. When she
> experiences a high she is very hyperactive and is agitated at times. She also reports
> that she sometimes gets up at five in the morning and has a high energy level. When
> she is low she is very sad and depressed. She will remain this way up to one week
> for no apparent reason. The claimant also has a history of some post-traumatic stress.
> She was raped at age eighteen and did get some counseling through the Horizons
> Program and also at the Family Service Agency. She currently takes medication.

(R. 160-61, Nov. 29, 2004 Report of Gregory C. Rudolph, Ph.D).

## B.

The medical records in the administrative record indicate that Ms. Flowers has been

hospitalized four times during her life. These four admissions are summarized below.

In 1998, at the age of 16, Ms. Flowers was admitted to Columba/Woodland Hospital for one

week. At that time, she was diagnosed with bipolar disorder and attention deficit disorder with

hyperactivity ("ADHD") (R. 187). Psychiatric records from this admission note a history of bipolar

mental illness in Ms. Flower's maternal lineage, including her mother (R. 194), and a history of

ADHD on the paternal side of her family (R. 198). Ms. Flowers was discharged with instructions

to take Depakote (250 mg.) and Risperdal regularly; on discharge, she had a Global Assessment of

5

Functioning ("GAF") score of 60 (R. 198).[2] Compliance with medication was considered a key to continued progress for Ms. Flowers (R. 198).

On October 21, 2001, at the age of 19, Ms. Flowers was admitted to Centegra Health System Memorial Medical Center for eleven days (R. 209-221). Treatment notes indicate that this was her "third admission" (R. 217), although the record does not contain any evidence of a previous hospital admission other than to Columbia/Woodland in 1998. Ms. Flowers was diagnosed with bipolar disorder (manic phase without psychotic features) and obesity (R. 209). The hospital report indicated that a cause of the mania was medication noncompliance and that Ms. Flowers was "clearly not impressed" that discontinuing the use of Zoloft (a prior medication for depression) "may have been contributing to her mania" (R. 209). Ms. Flowers's GAF was 40 on admission on the 250mg. of Depakote prescribed (R. 209). However, when the dose was increased to 500 mg., her blood levels revealed a GAF of 100, which indicated that "she was not actually taking the medication as prescribed at home" (R. 209). When questioned about medication compliance, Ms. Flowers admitted that she had not been taking the Depakote as prescribed because she was concerned about her weight (R. 209). Ms. Flowers was stabilized on 1000 mg. of Depakote and 400 mg. of Seroquel, and was discharged with instructions to continue those doses (R. 209). On discharge, Ms. Flowers's GAF was 65 (*Id.*).

---

[2] The GAF score is a rating of overall psychological functioning. A rating of 31-40 denotes some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF rating of 41-50 denotes serious symptoms or any serious impairment in social, occupational or school functioning. A GAF rating of 51-60 denotes moderate symptoms or moderate difficulty in social, occupational, or school functioning. A GAF rating of 61-70 denotes some mild symptoms or some difficulty in social, occupational or school functioning, but that the individual is generally functioning pretty well, and has some meaningful interpersonal relationships. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed. 2000).

On March 14, 2003, at the age of 21, Ms. Flowers was admitted to Centegra with a GAF score of 45 (R. 207). She was diagnosed with bipolar disorder, obesity and depression, as well as a history of post-traumatic stress disorder related to a sexual assault, which occurred in the year 2000 when she was 18 years old (R. 207-08). Ms. Flowers was discharged on March 21, 2003 with a GAF of 58; she was instructed to continue use of Depakote (500 mg.), as well as Wellbutrin and Klonopin (R. 208).

On June 8, 2004, at the age of 22, Ms. Flowers again was admitted to Centegra, complaining of major depression, suicidal ideation, fatigue and mood changes (R. 200-201). She was diagnosed with bipolar disorder, major depression and fatigue (R. 200). The reporting doctor (Dennis Brightwell) noted that Ms. Flowers believed she was "doing fairly well for a long time on Depakote ER 1000 mg. at bedtime," but that her treating physician, Dr. Elizabeth McMasters, had recently "started her on Abilify and decreased the Depakote" (R. 200). After conflicting advice from another doctor, Ms. Flowers stopped using the Abilify "and her mood instability started a few days later." Dr. Brightwell continued Ms. Flowers on 1000 mg. of Depakote and discontinued the use of Abilify; thereafter, Ms. Flowers's "mood stabilized rapidly" (R. 200). Ms. Flowers's GAF on admission was 40; on discharge it had increased to 50 (*Id*.).

## C.

Apart from the hospitalization report summaries, the medical treatment records for Ms. Flowers begin with her treatment by Dr. McNally of Columbia/Woodland Hospital in October of 1997. Dr. McNally's notes recount her history from that time until her admission to Columbia/Woodland in 1998:

[Ms. Flowers] reported the development of anxiety-like symptoms during the 7th grade. In some difficult social situations, she would feel extremely overwhelmed. She was started on Prozac by her mother's physician but this was not helpful. She also took [a] low dose of Mellaril and found the Mellaril to be quite helpful. It reduced her anxiety and helped her with sleep.

At that time, Dawn reported feeling well. There were no depressive symptoms. She denied any history of mania. She was having trouble with focus and concentration. During a follow up visit in March of 1998, Dawn was started on a trial of Ritalin. She had titrated off of Mellaril in the meantime. She also has hypothyroidism and is being maintained on Synthroid. The Ritalin seemed to help with focus and concentration, and her grades improved. Over the past week, her mother has become increasingly concerned over her behaviors. Dawn has been describing cars following her. Some days she is very slow moving, while other days she's quite energetic. Her appetite has dropped off. Her mother described her behavior as if "drunk." Dawn denied any drug or alcohol use. . . . When Dawn's father holds her by the arm to get her away from [a] situation, she reports that he hurt her badly and called the police. Things escalated from there. She was evaluated at an outside emergency room. Once she presented at Woodland Hospital, a call to DCFS was also made because of this one time incident.

Dawn continues to display intrusive speech. Her thoughts are racing. Her speech is pressured. She expresses paranoi[a]. Since being on the hospital unit, she has reported that rats are everywhere, and they are after her. She is not focused at all during groups.

(R. 193-94).

The next set of treatment notes are from the October 21, 2001 hospitalization (R. 209-12). Other than what has been noted above about that hospitalization, the treatment notes indicate that Ms. Flowers's mother reported problems with Ms. Flowers's mood since sixth grade. At that time, Ms. Flowers had been seeing Dr. Gumidyala at Horizons Hospital, and had been treated with Depakote and Zoloft. The treatment notes indicate that Ms. Flowers had held "multiple jobs," losing one job because she chose to be with her boyfriend rather than attend to work (R. 215). The notes further relate stress for Ms. Flowers related to the relationship she had with her boyfriend and his

parents, as well as arguments with her mother. The notes then indicate that Ms. Flowers was having nightmares related to the rape that she experienced in 2000.

Beginning on July 21, 2003 and continuing through February 18, 2005, Ms. Flowers was treated by various doctors at the Family Service & Community Mental Health Center for McHenry County ("FSMHC") (R. 145-158). Ms. Flowers presented herself at FSMHC on July 21, 2003, to Dr. Kathryn Vuper, a staff psychologist, indicating that she had "been going to Horizons" and wanted to transfer "back to Family Service after working with" a therapist at Horizons "for approximately the past 2-1/2 to 3 years," because she wanted to change therapists. Ms. Flowers indicated that her symptoms began at "age 13 when she would feel sad for no reason and experience mood swings." She said her biggest stress "in the last 2 to 3 years" had been parental conflict, separation and divorce. Dr. Vuper diagnosed Ms. Flowers with Axis 1 Bipolar II Disorder (by history); Axis III Moderate Obesity; and a GAF of 63 (R. 147).

On August 18, 2003, Ms. Flowers returned to see Dr. Vuper. At this session, Dr. Vuper found that Ms. Flowers was "doing well on a very lose dose of Depakote ER" and she persuaded Ms. Flowers to wean herself off of Clonazepam, a medication to help one sleep that could become addictive. Dr. Vuper also noted that Ms. Flowers had a Social Security Disability Evaluation done at Horizons. Dr. Vuper stated that she "encouraged [Ms. Flowers] to not be leaning toward disability as a means of supporting herself, because that is not therapeutic." She "pointed out that most people with bipolar can work and that her inability to hold jobs in the past was not because of her illness per se, but [instead]. . . non-compliance with medication and therapy." (R. 148). Dr. Vuper indicated that Ms. Flowers had a GAF of 64 during this visit.

9

On September 15, 2003, Dr. Vuper noted that Ms. Flowers would discontinue use of Clonazepam, felt in a good and consistent mood, and was looking for a full-time job ( R. 149). Her GAF was 70. On October 20, 2003, Dr. Vuper reported continued well-being by Ms. Flowers, stating she was "doing very well on Depakote ER alone" and expressing hope that she would be "getting full time employment" soon. Her GAF was 73 (R. 151). Dr. Vuper's report from December 1, 2003 indicates that Ms. Flowers obtained a full-time job at Famous Footwear, and was doing well on Depakote ER without side-effects. She rarely used Clonazepam, and was "very stable at this point" (R. 151). Her GAF was 76 (R. 151).

Although Ms. Flowers was instructed to return to the clinic in one to two months, the next report is dated April 30, 2004, nearly six months later (R. 152). At this therapy session, Ms. Flowers was treated by Dr. Elizabeth McMasters, Associate Medical Director a FSMHC. Ms. Flowers reported being "real irritable, tired" and suffering from "insomnia and poor attention in the last few weeks (R. 152)." Ms. Flowers reported having a part-time job in telemarketing at this time. She continued to live with her mother and had a close relationship with her boyfriend who "she met at her previous job" (R. 152). Ms. Flowers indicated that she had been under the care of Dr. Brightwell, taking high doses of Depakote (500 mg.) and thus gaining weight (although Dr. McMasters noted that Ms. Flowers had been maintained on a lower does of Depakote until this time) (R. 152). Ms. Flowers did not want to take any medication which might cause further weight gain (R. 152). Dr. McMasters added Abilify to Ms. Flowers's medication regimen for mood stabilization. On May 28, 2004, Dr. McMasters wrote that Ms. Flowers had stabilized on Abilify and Depakote with no lingering side effects, and had a "brighter mood and affect" (R. 153).

However, on June 7, 2004, Ms. Flowers reported "frequent mood changes" in the previous week. Ms. Flowers ceased using Abilify and increased her Depakote to 1000 mg. She was tearful but easily soothed (R. 155). The next day, June 8, Ms. Flowers was admitted to Centegra. After that hospitalization, on June 17, 2004, Ms. Flowers was admitted to the Day Hospital at FSMHC. Dr. McMasters indicated she had been in crisis all week, reporting "overwhelming anxiety" and post-traumatic stress disorder symptoms (R. 155). Seroquel was prescribed for sleep. Medications were monitored (R. 155). By July 28, 2004, Ms. Flowers was reported as stable and doing "very well" and "tolerating her medication fine." She was also reported as seeking work (R. 156).

On November 29, 2004, Dr. Gregory C. Rudolph, Ph.D., performed a consultative examination on Ms. Flowers, based on a referral from "BDDS" (or from the SSA) after Ms. Flowers filed her application for benefits (R. 150-162). Dr. Rudolph noted that on the date of the examination, Ms. Flowers's mood "reflected a general tone of euphoria." (R. 161). Dr. Rudolph diagnosed Ms. Flowers with bipolar disorder and post-traumatic stress disorder related to the sexual assault or rape of Ms. Flowers in 2000 (R. 159).

There were also two mental assessments, based on Ms. Flowers's medical record, performed on December 16, 2004, at the request of SSA, by Dr. Carl Hermesmeyer: a mental Residual Functional Capacity ("RFC") assessment (R. 163-165); and a Psychiatric Review Technique ("PRT") assessment (R. 167-179). Those assessments later were reviewed and "affirmed" for SSA by John Tomassetti, Ph.D., as of March 30, 2005 (R. 181). The mental RFC indicates that Ms. Flowers was moderately limited in the ability to understand and remember detailed instructions, as well as the ability to carry out detailed instructions (R. 163). Dr. Hermesmeyer concluded as follows:

11

The claimant has a diagnosis of bipolar disorder and PTSD. The severity does not meet or equal any mental listings, but is more than non-severe. Although the claimant may have problems with understanding, remembering, and the ability to carry out detailed instructions, the claimant retains the mental capacity to perform simple one- and two-step tasks at a consistent pace.

(R. 165).[3]    On the PRT, Dr. Hermesmeyer stated that Ms. Flowers's medical record implicated

Listing Categories 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). As for each

of those listed disorders, under the "B" criteria of the Listings (R. 177), Dr. Hermesmeyer found mild

limitation in restriction of daily living activities; moderate limitation in maintaining social

functioning; and moderate limitations in difficulties in maintaining concentration, persistence or pace

and no limitations in episodes of decompensation of extended duration. Dr. Hermesmeyer then

considers the "C" criteria of the Listing. To satisfy those criteria, there must be:

Medically documented history of a chronic . . . affective (12.04) disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.    Repeated episodes of decompensation, each of extended duration.
2.    A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.
3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

(R. 178) (the same applies to Listing 12.06). Dr. Hermesmeyer found that the "[e]vidence does not

establish the presence of the "C" criteria" for either Listing 12.04 or Listing 12.06 (R. 178).

Dr. Hermesmeyer did not explain the basis for that finding.

---

[3]On the PRT, Dr. Hermesmeyer checked a box that a Residual Functional Capacity ("RFC") Assessment was necessary (R. 167). We assume that the mental RFC Dr. Hermesmeyer performed on the same date (R.163-65) satisfied that requirement. Since Ms. Flowers does not claim physical disabilities, we do not believe the absence in the record of a physical RFC is material.

Ms. Flowers continued to see Dr. McMasters through at least February 7, 2006, based on Dr. McMaster's progress notes (R. 222-229). These notes do not provide much data; instead, they appear to reflect minimal medical management and minimal or no psychotherapy, with a series of cancelled appointments by doctor and patient alike.

In addition, Dr. McMasters wrote two letters to the SSA on behalf of Ms. Flowers. The first is dated February 18, 2005, and summarizes what the treatment notes have stated:

> Dawn Flowers has been under psychiatric care for several years at various hospitals and at [FSNGC]. She suffers from a chronic mental disorder for which she needs ongoing . . . maintenance [and] psychiatric treatment. Due in part to her disabling illness, [Ms. Flowers] has been unable to keep more than twenty jobs in the past five years. She will require vocational rehabilitation to be able to succeed in the workplace (R. 158).

The second letter is dated December 8, 2005. In that letter, Dr. McMasters opined that Ms. Flowers "has had difficulty keeping jobs due to her symptoms and coping style," and would be "most successful with a part-time supportive vocational program in the community." Dr. McMasters closed with an appeal that SSA consider Ms. Flowers' impairments in determining her eligibility for benefits (R. 183).

**D.**

The administrative hearing was held on May 9, 2006. The ALJ, a vocational expert ("VE"), as well as Ms. Flowers, her attorney, and her mother attended. In addition, Dr. Mark Oberlander, a psychologist serving as a medical expert, attended and testified.

Ms. Flowers testified that, at the time of the hearing, she was working at the Pioneer Center in the "Snack Shack," where she did inventory and cashier work four days a week on a part-time

13

basis, earning $6.50 per hour (R. 252-53). When questioned by the ALJ as to whether she was capable of full-time work at the Snack Shack, Ms. Flowers testified:

> If it was full-time, I would be capable, I'm pretty sure I would be, unless, you know, something came along, if my medications weren't right which cause me to get stressed out or hospitalized, that has happened before and that has been a preventive thing. I'd say another, if it was [a] job, like I worked at Other Road computing before. That was a really high impact stressful job. I was invoicing and I was put on to do so much other stuff and that was very stressful on me. . . . I would say that would be a prevention. The job now, I really don't see a problem with full-time.

(R. 253-54).

The ALJ then asked a series of questions to establish that Ms. Flowers formerly held jobs in telemarketing, as a cashier, in customer service, in stock, as a library invoicer, and as a water aerobics instructor (R. 254). The ALJ questioned Ms. Flowers as to whether she thought she could perform those jobs or perhaps a job as a janitor or hotel cleaner as long as she did not have to be around too many people and was not in a stressful job. Ms. Flowers did not answer that question, only emphasizing that "multi-tasking is a big stress for [her]" and had been since "grade school" (R. 255).

The ALJ also confirmed that Ms. Flowers was seeing Dr. McMasters for medication management every three months and had been "pretty stable" in the year prior to the hearing (R. 255). The ALJ also confirmed that she was seeing a therapist, Mr. Scott Brown, every four weeks at FSMHC (R. 256). Ms. Flowers stated that she thought the counseling, as well as a partial day program, helped her remain stable and that she had not been in the hospital since June 2004 (R. 257). At the time of the hearing, Ms. Flowers denied any depression, crying spells, suicidal thoughts or manic episodes since the June 2004 hospitalization. She testified only to occasional stress, and said: "I'm, you know, pretty stable" (R. 259).

14

The ALJ then asked Ms. Flowers about her daily activities. She said that a typical day involves getting up, eating breakfast, talking on the phone to family or friends before work, planning what she will do after work, going to the store or "catch[ing] a bite to eat somewhere before [she] go[es] off to work," and then working until three or four o'clock. Sometimes she babysits after that, or she might watch television until dinner time. She then goes "to a lot of stores just to, you know, get out" or spends time "hanging out with friends" or "going swimming" (R. 260). When questioned further, Ms. Flowers admitted to doing some cooking and cleaning around the house, as well as dishes, laundry and grocery shopping. She indicated that she had a health club membership, as well, and that she goes to the gym two or three times per week. When asked how much she earns babysitting, she testified that it is usually $50-100 per month.

Regarding social relationships, Ms. Flowers testified that she gets along well with family and friends and had a boyfriend whom she saw four times a week. She clarified that this was not the same boyfriend she had conflict with when she was admitted to the hospital in June 2004 (R. 263).

On examination by her own attorney, Ms. Flowers testified that the main cause of her former work-related stress was having to do more than one thing at a time, the loss of sleep because of this stress, and then the related inability to focus and concentrate, which has been a problem for her since elementary school (R. 263-64). According to Ms. Flowers, she would become stressed out and then start crying and have to go home from work, or she couldn't even get to work in the morning (R. 264-65). One example she noted was the time when she "had been yelled at by a boss," because she forgot to do something she knew how to do and had done consistently for the past year. She said she became "so stressed" that she "just up and walked out" (R. 265). Ms. Flowers also indicated that she was not able to accept any kind of criticism well (R. 265-66).

15

Ms. Flowers's mother, Colleen, testified that Ms. Flowers is "easily agitated" when someone reprimands her (R. 268). Dawn's mother also testified that Dawn is easily angered (R. 268), and that she has had a conflicted relationship with her daughter until recently when Ms. Flowers has been able to attend the Pioneer Center. In general, Ms. Flowers's mother confirmed that the claimant is "doing better," but she attributes this to the Pioneer Center, a vocational training center which has provided Ms. Flowers with specific attention to her learning disabilities and her mental/psychological needs (R. 269-70). In other words, Ms. Flowers's mother testified that "it's a well nurtured place. I think that's why she's doing so well this year" (R. 270).

The ALJ then called Dr. Mark Oberlander to testify as a medical expert. Dr. Oberlander was asked to render an opinion as to the types of impairments Ms. Flowers had. He sated that the medical file suggested impairments under Social Security Listing 12.04, and that "[d]iagnostically, treating sources have characterized it as a bipolar disorder," but he "believe[d] that somehow the bipolar diagnosis had somehow been started earlier and the treatment to be of no record . . . ," so that he did not "believe that there is a bipolar here." Instead, he said, "I believe it's a major depression NOS, and good response to medication" (R. 271). Dr. Oberlander also testified that there was some evidence in the file suggesting "the existence of symptoms under 12.06" (R. 271), as well as "a PTSD [post traumatic stress disorder] syndrome (R. 272)," but he "didn't really see any support for that[,]" except for one reference or "mention of an anxiety syndrom[e] . . . in [a] letter from Dr. McMasters." Dr. Oberlander found it significant that the PTSD syndrome did not "appear on any of the medication management notes" as a "diagnosis." Although he acknowledged evidence of anxiety and trauma leading to anxiety, Dr. Oberlander cited the lack of clinical data from Verizons, where Ms. Flowers was treated for two and a half to three years prior to starting treatment at FSMHC

in July 2003 (R. 272), but later testified that the records from FSMHC provided an "accurate . . . body of data to work with" for most of the onset period (R. 276).

Dr. Oberlander opined that Ms. Flowers had improved under the care of Dr. Vuper and Dr. McMasters: her GAF scores are generally higher and she seems stable on her medications (R. 272-73). He agreed with the agency reviewer, Dr. Hermesmeyer, as to the degree of Ms. Flowers's work-related limitations (R. 167-181) and that under the "B" and "C" criteria for listings 12.04 and 12.06, "there's insufficient evidence regarding any episodes of decompensation of extended duration as defined by Social Security Law, and C criteria do not apply in this case" (R. 273). Dr. Oberlander further opined that, although Ms. Flowers has documented difficulty with multi-tasking, the record indicates that she can concentrate and focus on "one to two, maybe even three step operations" (R. 274), especially since she indicates that she has developed computer skills (R. 273). Dr. Oberlander suggested that Ms. Flowers could perform a job with "some allowance for reduced contact with supervisors" and limited to single to three step tasks (R. 274). Dr. Oberlander further testified that Ms. Flowers's work "in a part-time supportive vocational program in the community" was "compatible" with her ability to do competitive work with the adjustments he described (R. 275).

Finally, the ALJ called the vocational expert, Mr. William Newman, to testify. The VE was asked what, if any, jobs a person could perform given the following hypothetical: a 24-year old individual with the work experience and education of the claimant; no exertional limitations; but limited to jobs that are simple and routine and of low to moderate stress where the person had reduced contact with supervisors.[4] Based on this hypothetical, the VE opined that Ms. Flowers could

---

[4]On this point, the Court notes that the transcript contains the phrase "used" contact with supervisors (R. 278). We ascribe this to a transcription error, in light of the ALJ's opinion referring to an RFC limiting Ms. Flowers to "reduced" contact with supervisors (R. 21).

do her previous work as a cashier, which the VE stated was an unskilled job, as well as the library clerk position, even though it was identified as a semi-skilled job with an "SVP" level of 2 (R. 279-80).[5] The VE also opined that at the medium level of exertion, Ms. Flowers could perform the jobs of janitor/cleaner (R. 279). At the light level of unskilled work, she could also perform the jobs of machine tender and hand packer (R. 279). The VE testified that each of these jobs existed in sufficient numbers in the Chicago area (R. 279). The VE testified that none of his descriptions of those jobs conflicted at all with the definitions in the Dictionary of Occupational Titles (R. 279). The VE did stated that a claimant's "moderate restriction to attention and concentration" could "have an effect" on the claimant's ability to perform any of these jobs" (R. 280).

## E.

In her opinion, the ALJ found that Ms. Flowers satisfied the requirements for Steps 1 and 2 (R. 20-21). Specifically, the ALJ found that she met the insured status requirements through June 30, 2009 had not engaged in substantial gainful activity at any time relevant to the proceedings, and had the following severe impairments: depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and, personality disorder, not otherwise specified. The ALJ found that these severe impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). The ALJ found support for this finding in the testimony of Dr. Oberlander (R. 21). The ALJ specifically found that, although the evidence did satisfy some of the "B" criteria

---

[5]"SVP," or Specific Vocational Preparation, is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. *See* 1991 WL 688702 (G.P.O.), App. C.

for these listed impairments, "[t]he evidence does not establish the presence of the "C" criteria" (R. 21), which are necessary to find a disability at Step 3.

Turning to the RFC, the ALJ found that Ms. Flowers has "the residual functional capacity to perform simple, routine job tasks that involve low to moderate stress and reduced contact with supervisors" (R. 21). The ALJ based this finding on a review of the record evidence, as well as on her credibility determination of Ms. Flowers.

On this latter point, the ALJ stated that he found "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible" (R. 24). The ALJ provided several reasons for this finding: (1) "the course of treatment pursued by her treating sources has not been consistent with what one would expect if the claimant were truly disabled"; (2) "if the claimant were truly disabled by her alleged impairments, one might expect to see more significant physical examination abnormalities"; (3) "any treatment the claimant has received for her alleged impairments has been essentially routine and/or conservative in nature, and not generally the type of medical treatment one would expect for a totally disabled individual"; (4) "although the claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in her favor, the medical records show that the medications have been relatively effective controlling the claimant's symptoms"; (5) "[a]lso notable in judging the credibility of the claimant's allegations is the fact that the claimant described daily activities which are not limited to the extent one would expect, including the ability to currently work on a part-time basis, given the complaints of disabling symptoms and limitations" (R. 24). The ALJ concluded that

19

"[a]ll these factors lead to the conclusion that the claimant's complaints are out of proportion to the medical evidence" (R. 24).

The ALJ also stated that in reaching her RFC assessment, she gave "great weight" to Dr. Oberlander's testimony (R. 24). The ALJ gave more weight Dr. Oberlander's testimony than to that of Ms. Flowers's treating psychiatrist, Dr. McMasters, "based on his expertise, knowledge, and experience in evaluating medical evidence within the Social Security disability program" and "because certain aspects of" Dr. McMaster's "opinion are . . . consistent with the residual functional capacity determined" by the ALJ and Dr. Oberlander (R. 24). In addition, the ALJ found that the residual functional capacity conclusions reached by the State Disability Determination Services also supported the ALJ's finding of "not disabled" and, even though they were not treating/examining physicians, their assessments were entitled to some weight where they supported other evidence, namely, Dr. Oberlander's opinion (R. 24).

Finally, the ALJ concluded at Step 4 that Ms. Flowers had the RFC to perform her past relevant work as a cashier. The ALJ based this conclusion on Ms. Flowers's testimony that she felt she could do this kind of job on a full-time basis, as well as the VE's testimony (R. 25). The ALJ noted the VE's testimony about other jobs in the Chicago metropolitan area, but did not make any Step 5 determination (R. 25).

## IV.

Ms. Flowers has identified the following four issues on appeal: (1) the ALJ failed to consider Ms. Flowers' inability to hold a job as required under SSR 96-7p (that rule says the ALJ must consider a plaintiff's prior work record; her efforts to work; and how her symptoms affect her ability to work) (Pl.'s Mem. at 8-10); (2) the ALJ failed to follow 20 C.F.R. § 404.1527(d) when he decided

20

not to give controlling weight to the opinion of Ms. Flowers' treating physician (Pl.'s Mem. at 10); (3) the ALJ's credibility analysis does not comport with SSR 96-7p; and (4) the ALJ's Step 4 determination that Ms. Flowers could perform her past relevant work as a cashier is erroneous because (a) the job cannot be classified as past relevant work (Pl.'s Mem. at 17); and (b) the ALJ relied on the vocational expert's ("VE's") testimony, which was inconsistent with the Dictionary of Occupational Titles ("DOT") requirements for the job of "cashier" (Pl.'s Mem. at 17-18).

## A.

We address first Ms. Flowers's Step 4 argument, which we find dispositive. Two deficiencies in the ALJ's Step 4 analysis require a remand.

*First,* the "cashier" job that the ALJ finds compatible with Ms. Flowers' RFC arguably cannot be classified as "past relevant work" at Step 4. "Past relevant work" is defined as "work that [a person has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1). Ms. Flowers argues that the evidence fails to establish that her earnings as a cashier at the Pioneer Center were at the substantial gainful activity level (Pl.'s Mem. at 17). We agree. Although the Commissioner concedes this point as "technically correct" (Def.'s Mem. at 14), he argues that the Court should find that Ms. Flowers's testimony that "she was working part-time as a cashier and could work full-time at that position" (unless her medications "weren't right") overrides the evidence and regulations governing a Step 4 finding of past relevant work and/or past substantial gainful activity (Def.'s Mem. at 14). The Commissioner cites no authority for this argument, and we reject it. We find that the ALJ erred at Step 4 because Ms. Flowers does not have an earnings record to establish that her cashier job was "past relevant work."

21

*Second,* Ms. Flowers also argues that in making the Step 4 finding, the ALJ erroneously relied on the VE's flawed testimony about the nature of cashier work. As set forth above, the VE was asked whether Ms. Flowers could perform the job of cashier given the following RFC: a 24-year old with a high school degree and no exertional limitations, but who was limited to jobs that are simple and routine with low to moderate stress and reduced contact with supervisors (R. 278). The VE testified that Ms. Flowers could do this job, which he described as unskilled work (one that requires only one, two or three steps at a time) with an SVP of 2 (R. 279-80). The VE also stated this definition did not conflict with the DOT (R. 279).

However, the VE -- and thus the ALJ -- were in error on this point. The DOT lists the SVP for cashier as a "3" and not a "2," as the VE testified. *See* DOT § 211.462-014, 1991 WL 671841 (G.P.O.). This means that the cashier job is not an unskilled job, as the VE testified. According to the regulations, an unskilled job takes 30 days or less to learn. 20 CFR § 220.133. The DOT for cashier specifically states than an SVP level of 3 requires "[o]ver 1 month up to and including 3 months" to learn. The VE did not address this inconsistency in his testimony, and the ALJ did not address it in her written opinion. To the contrary, the ALJ specifically stated: "Pursuant to SSR 00-4p, the evidence provided by the vocational expert is consistent with the information contained in the Dictionary of Occupational Titles (DOT) and Selective Characteristics of Occupations (SCO)" (R. 25). The ALJ then adopted the VE's testimony, finding that the cashier job requirements were "consistent with the claimant's RFC as determined in this decision" and that "the claimant is able to perform 'past relevant work' as actually and generally performed" (R. 25).

22

The Commissioner does not dispute that the ALJ's reliance on the VE's testimony regarding the DOT requirements was erroneous. Instead, the Commissioner argues that the finding of non-disabled should be sustained because "[a]s the ALJ *noted*, the VE identified thousands of other jobs she could perform including: janitor/cleaner (medium) (83,241 jobs); machine tender (light) (13,135 jobs); and hand packer (light) (29,978 jobs)" (Def.'s Mem. at 14, citing R. 25, 279) (emphasis added). The problem with this argument is that the ALJ only "noted" this testimony: she did not rely on it, and she did not make any findings related to it under Step 5. Instead, she relied on the VE's flawed testimony regarding the cashier position at Step 4, and proceeded no further.

The Commissioner suggests that even if the ALJ's Step 4 finding is erroneous, a remand would be "futile" given the evidence in the record that Ms. Flowers "could still perform a significant number of other jobs" (Def.'s Mem. at 14): namely, jobs such as janitor/cleaner, machine tender and hand packer. However, the doctrine of futility cannot be used in this case. The doctrine of futility is used in cases where, although the ALJ commits a "technical" error, the substantive basis for the decision is supported by the evidence in the record and thus the decision would be the same, even if the Court remanded the case to correct the technical error. *See Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985). Here, although there is evidence that could support a finding of jobs a person with plaintiff's RFC could perform at Step 5, the ALJ did not make any findings at Step 5. We will not presume what the ALJ would do at Step 5, particularly in light of the VE's erroneous testimony concerning the nature of the cashier job. What's more, we note that while Ms. Flowers has the burden of proof at Step 4, at Step 5 the burden shifts to the Commissioner. The Court will not affirm a Step 4 decision by reference to a Step 5 finding that the ALJ never made.

23

**B.**

While we remand on the basis of the ALJ's flawed Step 4 finding, we address below, for the benefit of the parties and ALJ on remand, Ms. Flowers's other arguments.

1.

Ms. Flowers argues that the ALJ failed to consider her demonstrated inability to maintain employment on a consistent basis. Ms. Flowers argues that even if she has the RFC to *obtain* a job as a cashier, she does not have the RFC to *keep* this job once she is hired.

Residual functional capacity is defined as "what you can still do despite your limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). This assessment considers the "total limiting effects" of the claimant's impairments. 20 C.F.R. §§ 404.1545(e), 416.945(e). Thus, the determination of a claimant's residual functional capacity requires the ALJ to consider the underlying medical evidence, the medical opinion evidence, and the credibility of the claimant concerning the extent of his limitations. *Id.* In other words, given a person's severe limitations, found at Step 2, RFC is the capacity of this person to perform substantial gainful activity anyway by doing the tasks required by certain jobs. The question, of course, is what that RFC is and what jobs and job tasks that RFC fits.

Ms. Flowers is arguing that she does not have an RFC that would allow her to hold a job once she got it, and thus does not have the RFC to perform the tasks required by any job over a long period of time. We begin with the observation that many claimants may have the RFC to perform certain jobs that exist in the economy, but because jobs are scarce they cannot find one. This is not Ms. Flowers' argument. In fact, it appears that Ms. Flowers has been able to obtain multiple jobs. Her problem has been in her ability to sustain them.

24

Ms. Flowers argues that the ALJ should have considered more than the objective medical evidence in the record; instead, she argues, the ALJ should have considered the subjective circumstances of her past work experience to find that she does not have the RFC to perform the job of "cashier." For example, at the hearing, Ms. Flowers' attorney cross-examined the VE on this point and elicited testimony that a moderate restriction to attention and concentration could affect an individual's ability to sustain all the jobs the VE identified (R. 280). Ms. Flowers and her mother both testified that she had problems with attention and concentration (R. 265; 268), and the PRT assessment states that Ms. Flowers had moderate limitations in "maintaining concentration, persistence or pace" (R. 177). Ms. Flowers' argues that this kind of evidence should have been considered by the ALJ, but was not.

Ms. Flowers also points to several sources of authority for the proposition that an ALJ must consider a claimant's prior work record and whether she was able to hold jobs once she got them for a certain minimum period, as well as how Ms. Flowers's symptoms related to the claimed disability affected that ability to work and hold that job. For example, in *Kangail v. Barnhart*, 454 F.3d 627, 629-30 (7th Cir. 2006), the Seventh Circuit pointed out:

> Where it is established that the claimant can hold a job for only a short period of time, the claimant is not capable of substantial gainful activity. And though a job that the applicant held for more than six months cannot be deemed an unsuccessful work attempt, neither does it count as substantial gainful employment unless the applicant earned a specified minimum amount, . . .

454 F.3d at 629-30 (citing 20 C.F.R. § 404.1574(b)(3)) (other quotations and citations omitted). Gainful employment "is presumed if the applicant earned more than the specified monthly minimum for more than six consecutive months, 20 C.F.R. § 404.1574(b)(2)." *Id.* at 630.

25

Section 404.1574 is an extensive regulation that provides a formula for determining whether a person has engaged in gainful activity by the amount of money earned over a six-month period or more. In general, however, the regulation presumes that a person must have worked six months or more in a given job for it to count as gainful activity (this includes work in a "sheltered" or "special" workshop or work environment). *See id.,* at Section 404.1574 (a)-(c).

As Ms. Flowers points out, there is a letter from Dr. McMasters indicating that she had held more than 20 jobs in five years (R. 77-80); and, her employment records show that from 1998 through 2005, Ms. Flowers held 25 jobs with "minimal earnings" on all jobs (*Id.*). Moreover, there is medical evidence linking this failure to hold jobs to her conditions: Dr. McMasters stated that Ms. Flowers' inability to keep jobs has been "[d]ue in part to her disabling illness" (R. 158), which includes her "symptoms and coping style" (R. 183).

Ms. Flowers argues the ALJ has failed to consider whether Ms. Flowers's bipolar disorder may have caused her difficulty in sustaining employment, because the disease "may prevent the sufferer from taking her prescribed medications or otherwise submitting to treatment." *Kangail*, 454 F.3d at 630. In *Kangail*, the Seventh Circuit stated that the ALJ should have (but did not) consider this possibility, and for that reason vacated the Commissioner's determination on *Kangail*, 454 F.3d at 631. Similarly, in *Halvorsen v. Heckler,* 743 F.2d 1221 (7th Cir. 1984), the Seventh Circuit observed that:

> if the mere holding of a job for brief and intermittent periods undeniably established
> an ability to engage in substantial gainful activity, a modestly disabled person would
> have a substantial disincentive to try to procure work . . . If you are unable, because

26

of your impairments, to do ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work, this may show you are not working at the substantial gainful activity level.

*Id.* at 1227.

In *Kangail*, as in this case, the ALJ gave great weight to the fact that the claimant's symptoms were controlled when on medication. In this case, the ALJ indicated that the fact the evidence showed that Ms. Flowers had stabilized for over a year on her medications was persuasive evidence that she was not disabled. The *Kangail* court did not deem the evidence of stability while on medications sufficient to support a finding that the claimant could work, because the nature of a bipolar disorder is to render it difficult to comply with medication regimens.

On remand, the ALJ, in line with *Kangail*, should consider Ms. Flowers's prior failure to hold sustained full-time employment, as well as the relationship – if any – of her mental condition to her past failure to hold sustained, full-time employment.

**2.**

Ms. Flowers's argues that the ALJ failed to follow 20 C.F.R. § 404.1527(d) when she declined to give controlling weight to the opinion of Ms. Flowers' treating physician (Pl.'s. Mem. at 10). Section 404.1527, read as a whole, indicates that the ALJ is required to determine, in the first instance, whether to give "controlling weight" to the opinion of the treating physician. The only time an ALJ is required to do this is when there is no other evidence in the record which is inconsistent with the treating physician's opinion. In this case, there was inconsistent evidence, namely, the testimony of the medical expert called by the ALJ at the administrative hearing. Given those two contrary opinions, the ALJ explained that he would not give controlling weight to the opinion of the treating physician, Dr. McMasters (R. 24).

Instead, the ALJ stated that she gave "less weight" to the opinion of Dr. McMasters because she found that "certain aspects" of this opinion were "consistent with the residual functional capacity determined in this decision" (R. 24). Ms. Flowers's attorneys make much of this sentence, arguing that it is illogical (Pl.'s Reply Mem. at 4). We agree. Perhaps the word "consistent" is a typographical error, and the ALJ intended to state that Dr. McMaster's opinions were in some respects *inconsistent* with the RFC determined by the ALJ. If the sentence were read that way, then the sentence would make more sense. In other words, perhaps the ALJ was attempting to identify a conflict between medical opinion evidence in the record.

Where the medical opinions conflict, the ALJ is given the discretion in choosing what weight to give which opinion under Section 404.1527. The regulation lists a number of factors to consider in assigning weight to medical opinions. Here, the ALJ assigned "great weight" to the opinion of Dr. Oberlander's testimony. Given our decision to remand based on the Step 4 finding, we need not decide whether the ALJ's decision to do so was based on substantial evidence. On remand, the ALJ will be free to revisit that decision if she so chooses.[6]

### 3.

Ms. Flowers also argues that the ALJ's credibility analysis does not comport with SSR 96-7p. SSR 96-7p, an ALJ has wide discretion in determining the claimant's credibility:

> [i]n determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information

---

[6]There are aspects of Dr. Oberlander's testimony the ALJ may wish to revisit on remand. For example, Dr. Oberlander testified that Ms. Flowers did not suffer from bipolar disorder (R. 271), contrary to the evidence in the hospital records (R. 187, 200, 208, 209), from the treater, Dr. McMasters (R. 152), and from the state examiner, Dr. Hermesmeyer (R. 165). Dr. Oberlander also testified that only Dr. McMasters diagnosed Ms. Flowers with PTSD (R. 272), when that diagnosis is set further on the record of the 2003 hospital admission (R. 208) and in the assessment by Dr. Rudolph (R. 159).

28

provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

SSR 96-7p(4).

Here, the ALJ found that although Ms. Flowers impairments could be expected to produce the symptoms she alleged, Ms. Flowers' testimony of the intensity, duration and limiting effects of these symptoms was "not entirely credible" (R. 24). In particular, the ALJ found that Ms. Flowers' course of treatment was not of the type she would expect if she were "totally disabled." (R. 24). The ALJ also found significant the fact that the medications prescribed to Ms. Flowers were "relatively effective controlling the claimant's symptoms." Finally, the ALJ found important the nature of Ms. Flowers's daily activities "which are not limited to the extent one would expect, including the ability to currently work on a part-time basis" given her "complaints of disabling symptoms and limitations" (R. 24).

The Court notes that the ALJ did not explain how being hospitalized on four occasions and attending therapy was "routine or conservative" treatment for her condition (see Pl.'s Mem. at 14-15). We also note that the ALJ's reference to "high" GAF scores at the end of 2003 omits to note that her GAF dropped to 40/50 in 2004 when she was hospitalized (see Pl.'s Mem. at 15-16). On remand, the ALJ is free to consider whether these or other factors cause her to revisit this credibility determination.[7]

_____

[7]We note that there is some evidence in the record that Ms. Flowers needs a "supportive" environment, both at work and at home, to function well. The concept of such a supportive living environment is one of the "C" criteria in the Listings. The agency examiner found no evidence of this criteria; and the medical expert found likewise. However, the ALJ is free to re-examine this issue on remand if she sees fit to do so.

## CONCLUSION

For the foregoing reasons, the Court denies the Commissioner's motion for summary judgment (doc. # 29), and grants Ms. Flowers's motion for summary judgment (doc. # 24), remanding the case for the proceedings consistent with this decision.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: January 17, 2007